## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

KAYLA CLAUSON,                                    Case No. 21-CV-1141 (NEB/LIB)

              Plaintiff,

v.                                                ORDER ON MOTIONS FOR SUMMARY
                                                          JUDGMENT

STRIDE ACADEMY,

              Defendant.

---

Kayla Clauson was a teacher at Stride Academy. In the spring of 2020, Clauson informed the Academy that she was pregnant. When she had her baby in September and started her maternity leave under the Family and Medical Leave Act ("FMLA"), both parties understood that Clauson would return to work in January 2021. After Clauson cleaned out much of her classroom in early December, the Academy's principal contacted Clauson to ask if she was returning to work. When Clauson did not respond within a few hours, the Academy posted for her teaching position. The next day, Clauson learned of the job posting and resigned from the Academy. The Academy repeatedly asked Clauson to return and offered to remove the posting, but Clauson refused. She now claims constructive discharge and sues the Academy for FMLA interference and retaliation and violations of the Pregnancy Discrimination Act ("PDA"). The Academy counterclaims for unjust enrichment based on items that Clauson removed from the classroom and for

overpayment of wages. The parties filed cross-motions for summary judgment. For the reasons below, the Court denies Clauson's motion and grants the Academy's motion on Clauson's claims. As to the Academy's unjust enrichment claim, the Court declines to exercise supplemental jurisdiction and therefore denies the motion, dismissing the claim without prejudice.

## BACKGROUND

The Academy hired Clauson as a third-grade teacher for the 2019–2020 school year. (ECF No. 25-1 at 1; ECF No. 25-3 at 27–61 ("Clauson Dep.") at 17 (native pagination).) Clauson was an at-will employee who performed well and met or exceeded the Academy's expectations that school year. (ECF No. 25-1 at 3, 5–28.)

In early 2020, Clauson notified the Academy's principal and human resources administrator of her pregnancy. (Clauson Dep. at 26.) Both were supportive of and congratulated Clauson. (*Id.* at 26–27.) In May, Clauson submitted a formal request for FMLA leave to start in October, which was approved. (ECF No. 25-3 at 1–3.) A few days later, the Academy offered Clauson a teaching position for the 2020–2021 school year. (ECF No. 23 ("Williams Decl.") ¶ 3; ECF No. 25-3 at 4.) Clauson accepted the offer with the FMLA leave in place.

A new principal arrived at the Academy, and Clauson met with her in mid-July. (ECF No. 25-3 at 62–94 ("Anderson Dep.") at 19 (native pagination).) The new principal,

2

Gwen Anderson, was also supportive of Clauson in her pregnancy, including bringing her baby gifts. (Clauson Dep. at 35–36.)

Clauson returned to work for the 2020–2021 school year. Due to the COVID-19 pandemic, the Academy began the school year in distance learning, so Clauson taught her students virtually. (*Id.* at 39.) Clauson accrued paid time off ("PTO") each month under her employment contract. (ECF No. 25-1 at 3.) Though it is not the Academy's usual policy, Clauson asked the Academy to frontload her PTO so she could use it during her FMLA leave. (ECF No. 25-3 at 5–6, 125–26.) The Academy granted Clauson's request and frontloaded her PTO.[1] (*Id.*)

Clauson had her baby on September 30, which was the first day of her FMLA leave. (Clauson Dep. at 31.) On November 25, Anderson sent Clauson a text message to confirm that Clauson intended to return following her FMLA leave. (ECF No. 25-3 at 10.) Clauson responded, "[y]es." (*Id.*) The Academy planned on Clauson returning to teaching on January 4, following the Academy's winter break. (*Id.* at 5, 127.)

On Sunday, December 6, Clauson, her mother, and her sister came to the Academy and removed many supplies from her classroom. (Clauson Dep. at 43–46, 48.) Clauson told no one she was coming to get the items from her classroom; after removing the supplies, the classroom was left with only a few books and posters. (*Id.* at 43–44;

---

[1] Clauson disputes that she received all of her PTO but offers no evidence to support this position. The evidence shows that Clauson was paid for 15 days of PTO. (ECF No. 25-3 at 25.)

Anderson Dep. at 37, 51.) Many of the removed items belonged to Clauson; others were items that the Academy had paid for. (*See* Clauson Dep. at 44–46, 50–54; ECF No. 25-3 at 17.)

On December 7, Anderson discovered that nearly all of Clauson's supplies had been removed from her classroom; she thus was concerned that Clauson was intending to abandon her job and not return from leave. (Anderson Dep. at 33–35.) Anderson texted Clauson at 10:41 a.m. stating:

> Good morning Kayla! All of your personal items are no longer in your classroom. Are you indeed planning on returning for the remainder of the year? Please give me a call and we can talk more. Thank you!

(ECF No. 25-3 at 11.) Clauson did not respond to Anderson's text that day. (*See id.*)

Anderson then contacted Academy Executive Director Eric Williams. (Anderson Dep. at 41.) She told him that Clauson had "cleared out" all of her personal effects and classroom supplies and that Clauson "was not returning [her] messages." (*Id.*) Anderson also informed Williams that she "was concerned that if Ms. Clauson was changing her mind about returning, [the Academy] would be left without a teacher for a classroom of third graders." (*Id.*) Anderson shared that she had also heard that Clauson had applied for a daycare license, which contributed to her belief that Clauson may have abandoned her teaching position. (*Id.* at 39, 41.)

Williams told Anderson to contact Clauson and "[f]ind out what's going on." (ECF No. 25-3 at 95–124 ("Williams Dep.") at 14 (native pagination).) As the day progressed,

Williams decided to post an elementary teacher position as a precautionary measure. (*Id.* at 12–13.) Williams explained:

> We received information that Ms. Clauson had emptied her classroom out. And the principal had either called or texted her and asked her what was going on, and we never heard back from her within that day and we were panicked. It was clear to us that she had vacated and moved everything out of the classroom, and then not getting back to us, we had to act because it was December. We had to have a teacher in place by January 4th.
> . . .
> And so for us to post an elementary position, it was absolutely the right thing to do and we would do it again every time. . . . We were operating under the assumption that she had abandoned her post.

(*Id.* at 12–13; *see id.* at 14 ("[E]very day [was] important when you get a posting out because winter break [was] coming up and the kids [were] due back on January 4th.").)

> [W]e had no time to be trying to find a teacher in the middle of the year in the middle of a pandemic. I mean, that's a needle in a haystack. That's like finding something that's just not out there. And so we absolutely had to post right away.

(*Id.* at 19.) The Academy posted the elementary teacher position on December 7 around 4:00 p.m. (ECF No. 25-3 at 14; Williams Dep. at 23–24.)

Williams intended to take the posting down if Clauson responded and informed Anderson she planned to return. (Williams Dep. at 19.) Clauson responded to Anderson's text on December 8 around 9:00 a.m., after she had had learned about the posting from a colleague. (ECF No. 25-3 at 11; Clauson Dep. at 69–70.) Clauson told Anderson that she had seen the posting, was "quite angry and upset," and promised to "come get the rest of my things and turn in my keys sometime this week or next." (ECF No. 25-3 at 11.)

Anderson immediately telephoned Clauson, but Clauson did not answer. (*Id.*; Anderson

Dep. at 39.) Anderson then texted Clauson:

> I just called and left a message. We sure have not taken your job; don't
> worry! We know you applied for a daycare license and now you've cleaned
> out your classroom. If you aren't planning to leave, why did you take all
> your things? We feared you changing your mind, and that's why I called to
> talk with you. We hope you return, though we wanted to be prepared for
> the students with the limited information we had.

(ECF No. 25-3 at 11–12.) Clauson responded: "My intention was to finish the school year.

This is my notice. I'll gather the rest of my things and turn in my keys." (*Id.* at 12.)

Anderson responded to Clauson's notice of resignation by stating:

> Kayla, I was hoping and planning on you returning. That is what you had
> told me already, and that's what I understood. When I learned of your
> classroom, I wanted more information and was told to post the position just
> in case.
> I would love to take down the posting and have you stay. It is [y]our
> decision to submit your notice, and I will respect that. I would love to hear
> your decision after hearing this.

(*Id.*) Clauson did not respond. Anderson texted Clauson over the next few days asking if

she had given it more thought, and whether she would stay (and the Academy would

remove the posting), or resign. (*Id.* at 12–13.) Clauson eventually responded, "I'm sorry,

but I already gave you my decision – it didn't change. I won't be returning from my

maternity leave." (*Id.* at 13.)

Clauson sued the Academy for violating the FMLA and the PDA. The Academy

counterclaimed, alleging Clauson was unjustly enriched when the Academy overpaid

her $2,186.17 and when she removed $162.72 of supplies from the classroom. (ECF No. 25-3 at 17–25.) Each party now moves for summary judgment.

## ANALYSIS

### I.      Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (citation omitted). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322–23).

On cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and the record

in the light most favorable to the defendant when considering the plaintiff's motion. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

## II.    Pregnancy Discrimination Claim

Clauson asserts that the Academy violated Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), which prohibits an employer from discriminating on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e-2(a); *id.* § 2000e(k). An employee may establish pregnancy discrimination by direct or indirect evidence. *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 878 (8th Cir. 2010). "Direct evidence of discrimination is 'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Id.* (citation omitted).

Because Clauson relies on circumstantial evidence to prove this claim,[2] the Court analyzes her claim under the burden-shifting standard in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–04 (1973). Under this framework, Clauson must establish a prima facie case of discrimination by showing: "(1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of

---

[2] Clauson mentions in passing that her claims are also based on direct evidence, but offers no evidence or analysis supporting this statement. (ECF No. 33 at 6.) The Court sees no direct evidence of discrimination in the record.

8

discrimination." *Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 767 (8th Cir. 2014) (citing *Elam*, 601 F.3d at 878–79). If Clauson establishes a prima facie case, the burden of production shifts to the Academy to articulate "a non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." *Elam*, 601 F.3d at 879 (citation omitted). If the Academy meets this burden, Clauson must produce evidence sufficient to create a genuine issue of material fact that the Academy's proffered explanation is merely a pretext for discrimination. *Id.* "[T]he issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008) (emphasis in original) (quotation marks and citation omitted).

The parties agree that Clauson was a member of a protected group and was qualified for her position. They dispute whether she suffered an adverse employment action and whether her pregnancy motivated that action. They also dispute whether the Academy's action was pretextual.

A.   ***Prima Facie Case***

Clauson asserts an adverse employment action based on constructive discharge. (*See* Compl. ¶ 20 (alleging the Academy's posting that her job was available "compell[ed] her to resign").) "To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (citation

omitted). "The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012) (citation omitted). The employee must also give her employer "a reasonable opportunity to resolve a problem before quitting." *Id.*

Clauson has not shown that the Academy deliberately created intolerable working conditions. The evidence shows that the Academy gave Clauson positive evaluations, was supportive of her pregnancy, and expected her to return after her FMLA leave. When the principal saw that Clauson had cleaned out her classroom and could not reach her on December 7, 2020, she became concerned that Clauson had decided not to return to work. The Academy posted the teaching position as a precautionary measure that afternoon because it needed a teacher when classes resumed in early January 2021. Clauson claims that posting her job "while on maternity leave and finding out from a colleague is absolutely more than an unpleasant environment."[3] (ECF No. 33 at 7 (citing no

---

[3] To show that the posting was an adverse employment action, Clauson cites Williams' testimony that "he would be embarrassed or humiliated if his specific current position was posted without his knowledge and he discovered it from another source." (ECF No. 33 at 7.) But Clauson takes the inference from this testimony too far and ignores much of his response. When asked whether he "could imagine being embarrassed or humiliated" if his position was posted, Williams testified:

> Yeah. If that happened, I would ask the person what's going on. And then, if the conversation paralleled . . . [Clauson] and [Anderson], I would have said, Fine. Okay. Whatever. It was—it was a misunderstanding, but there are circumstances around why that was posted. It wasn't done in a vacuum. It wasn't that I was the victim, and somebody just posted a job for an executive director.

(Williams Dep. at 29–30.)

authority).) Her subjective feelings about the job posting are not enough to meet the standard. The standard is an objective one, *Sanders*, 669 F.3d at 893, and "a reasonable person in [Clauson's] position would not have felt compelled to resign as a result of the [Academy] posting her position as available." *Foshee v. Ascension Health-IS, Inc.*, 384 F. App'x 890, 892 (11th Cir. 2010); *see Poff v. Rockford Pub. Sch. Dist. No. 205*, No. 06 C 50135, 2009 WL 483844, at *3 (N.D. Ill. Feb. 25, 2009) (finding that posting that defendant's "position as available while she was on leave" was not constructive discharge).

The evidence also shows that Clauson failed to give the Academy a "reasonable chance to remedy the alleged mistreatment." *Blake*, 870 F.3d at 826 (quotation marks omitted). Upon discovering the job posting on December 8, Clauson immediately resigned, offering the Academy no opportunity to correct the misunderstanding. She rejected the Academy's repeated offers to take down the job posting and have her return to her position. Because Clauson did not give the Academy a reasonable opportunity to resolve the issue, her constructive discharge claim fails.

*Causal link.* Even if the Court agreed with Clauson about constructive discharge, Clauson cannot satisfy the fourth element of the prima facie case. To show the required causal link, Clauson points to the birth of her child "only a few short weeks[] prior to the adverse employment action." (ECF No. 33 at 8.) "Temporal proximity between the protected conduct and adverse action 'must be very close' for timing alone to be sufficient" to show a causal link. *Lors v. Dean*, 746 F.3d 857, 865–66 (8th Cir. 2014) (citation

omitted). Timing does not support a causal link between Clauson's pregnancy and the job posting. Clauson informed the Academy of her pregnancy in the spring of 2020, well over six months before she had her baby and began her FMLA leave in late September. *See Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (explaining that, "this court looks to the date an employer *knew* of an employee's use (or planned use) of FMLA leave" in determining temporal proximity (emphasis added)). The Academy posted for her position in early December. "[M]ore than two months is too long to support a finding of causation without something more." *Lors*, 746 F.3d at 865–66 (citation omitted); *see Sisk*, 669 F.3d at 901 (same). Because Clauson provides no other evidence of a causal link between her protected status and the job posting, she fails to establish a prima facie case.

### B.   *Legitimate Non-Discriminatory Reason and Pretext*

And, even if Clauson could establish a prima facie case, she offers no evidence that the Academy's proffered reason for posting the position—that the posting was a precautionary measure because the Academy believed Clauson was not returning—was pretextual.

*Legitimate nondiscriminatory reason.* Based on Clauson's removal of supplies from her classroom and recently-obtained daycare license, the Academy's principal and executive director both believed that Clauson may not return to the school. (Anderson Dep. at 33–35; Williams Dep. at 12.) And the circumstances were difficult, with timing a critical issue: the school was on winter break, with only a few weeks before the start of

12

classes. Because it would be difficult to find a teacher to replace Clauson in the middle of the school year, in the middle of a pandemic, and on short notice, the Academy posted the teaching position as a precautionary measure. (Anderson Dep. at 55–56; Williams Dep. at 14, 19.) The Academy thus offers a legitimate, nondiscriminatory reason for posting the position.

*Pretext.* Clauson has not carried her burden to raise a genuine issue of material fact as to pretext. Pretext can be established by "showing the proffered explanation has no basis in fact," or "that a prohibited reason more likely motivated the employer." *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021) (citation omitted). And even if Clauson had shown that the timing of the job posting was suspicious, "timing alone is not enough to establish pretext." *Id.* (citation omitted).

Clauson offers no evidence of any discriminatory animus by the Academy. Indeed, the entire record demonstrates the opposite. After learning of Clauson's pregnancy, the Academy extended Clauson an offer to teach in the upcoming 2019–2020 school year and granted her request to frontload her PTO. And as Clauson admits, the human resources director and both principals were supportive of her pregnancy. The evidence all points to the Academy's posting the teaching position because of a concern that Clauson was not returning to work, not because of her pregnancy.

For all these reasons, the Court grants summary judgment for the Academy on Clauson's PDA claim.

### III.    FMLA

The FMLA provides eligible employees "12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1). Clauson asserts that the Academy (1) retaliated against her and (2) denied her FMLA benefits by "interfer[ing] with [her] right to take leave and publicly post[ing] her job as available to other persons." (Compl. ¶¶ 32–33.) She fails to prove, or raise a genuine issue of material fact as to, her FMLA claims.

### A.    *FMLA Interference Claim*

Under the FMLA, an employer is prohibited from interfering with, restraining, or denying an employee's exercise or attempted exercise of any right in the FMLA. 29 U.S.C. § 2615(a)(1). To succeed on her FMLA interference claim, Clauson "must show she was eligible for FMLA leave, the employer knew she needed FMLA leave, and the employer denied her an FMLA benefit to which she was entitled." *Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016). The Academy asserts that Clauson's FMLA interference claim fails because it cannot establish that she was denied an FMLA benefit to which she was entitled. The Court agrees. The evidence shows that the Academy granted Clauson's request for FMLA leave. Clauson offers no evidence that the Academy revoked that leave.

Clauson claims that the Academy interfered with her FMLA leave by posting the teaching position during her leave, thus preventing her from returning to her position after her leave. She points to no evidence or law suggesting that posting the position prevented Clauson from returning to the Academy after her FMLA leave. And even if

14

the Academy had filled the position previously held by Clauson, the FMLA allows an

employer to reinstate an employee to "the same position . . . *or* to an equivalent position

with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R.

§ 825.214 (emphasis added); *see Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025,

1029 (8th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)). Clauson resigned before her FMLA

leave ended, despite the Academy's pleas for her to return to work. Because Clauson has

not raised a genuine issue of material fact as to whether the Academy fulfilled its

obligations under the FMLA, the Academy is entitled to summary judgment on Clauson's

FMLA entitlement claim.

### B.     *FMLA Retaliation Claim*

An FMLA retaliation claim arises "if an employer takes 'adverse action' against an

employee who 'opposes any practice made unlawful under the FMLA.'" *Brown v.

Diversified Dist'n Sys., LLC*, 801 F.3d 901, 909 (8th Cir. 2015) (citation omitted). Because

Clauson offers no direct evidence of retaliation, her claim is evaluated under the *Mc-

Donnell Douglas* burden-shifting framework described above. *Sisk*, 669 F.3d at 899. First,

to establish a prima face case of FMLA retaliation, she "must show that: 1) she engaged

in protected conduct; 2) she suffered a materially adverse employment action; and 3) the

materially adverse action was causally linked to the protected conduct." *Id.* at 900

(citation omitted). As with her PDA claim, Clauson alleges that the Academy's posting of

the teaching position while she was on FMLA leave was a materially adverse action. It is

not. Because Clauson fails to raise a genuine issue of fact as to a prima facie case of FMLA retaliation, the Academy is entitled to summary judgment on this claim.

## IV.    Unjust Enrichment Claim

The Academy also moves for summary judgment on its unjust enrichment claim.

The parties are not diverse, and therefore the Court does not have original jurisdiction over this state-law claim.[4] The Court could exercise supplemental jurisdiction over the claim under 28 U.S.C. Section 1367(a), but because the claims over which the Court has original jurisdiction are being dismissed before trial, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir. 2008). Thus, the Academy's unjust enrichment claim is dismissed without prejudice "so that it may be considered, if at all, by the courts of Minnesota." *Id.* at 726; *see Ivy v. Kimbrough*, 115 F.3d 550, 552–53 (8th Cir. 1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without prejudice to avoid needless decisions of state law as a matter of comity and to promote justice between the parties." (cleaned up, citation omitted)).

---

[4] The parties do not dispute that Minnesota law applies to this claim. (*See* ECF No. 22 at 28 (citing cases applying Minnesota law to unjust enrichment claims).).

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED that:

1.    Defendant Stride Academy's Motion for Summary Judgment (ECF No. 20)

is GRANTED IN PART AND DENIED IN PART as set forth above;

2.    Plaintiff Kayla Clauson's Cross-Motion for Summary Judgment (ECF

No. 28) is DENIED;

3.    Kayla Clauson's claims against Stride Academy are DISMISSED WITH

PREJUDICE;

4.    Stride Academy's counterclaim for unjust enrichment is DISMISSED

WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 4, 2022                    BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge